IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EXECUTIVE RISK INDEMNITY, INC.,          )
                                          )     Case No. 03 C 3224
                    Plaintiff,            )
                                          )     Judge Mark Filip
          v.                              )
                                          )
CHARTERED BENEFIT SERVICES, INC.,         )
                                          )
                    Defendant.            )

## MEMORANDUM OPINION AND ORDER

This is an intercorporate dispute about insurance coverage. Specifically, the case

involves a declaratory judgment action brought by Plaintiff, Executive Risk Indemnity, Inc.

("Executive Risk"), against Defendant, Chartered Benefit Services, Inc. ("Chartered Benefit").

Executive Risk seeks a declaration that certain insurance policies do not cover a claim made

against Defendant, Chartered Benefit, by Aaron and Charlotte Sugarman (the "Sugarman

Claim"). (D.E. 1.)[1] The case is before the Court on Executive Risk's motion for summary

judgment ("Motion") (D.E. 12) and Chartered Benefit's cross-motion for summary judgment

("Cross-Motion") (D.E. 21). For the reasons stated below, the Court grants Executive Risk's

Motion, and denies the Cross-Motion of Chartered Benefit.


## I.      Background

The relevant facts are taken principally from Executive Risk's Local Rule 56.1 ("L.R.

56.1") statement of facts ("Pl. SF") (D.E. 14), Chartered Benefit's response to Executive Risk's

statement of facts ("Def. Resp. to SF") (D.E. 19), Chartered Benefit's L.R. 56.1 statement of

---

[1]      The various docket entries in this case are cited as "D.E. __."

facts ("Def. SF") (D.E. 20), and Executive Risk's response to Chartered Benefit's statement of facts ("Pl. Resp. to SF") (D.E. 27).[2]

A.     The Sugarman Claim

The origins of the instant dispute stem from litigation initiated by Aaron and Charlotte Sugarman in Oregon. That litigation was settled long ago, and the merits are not at issue here. The Sugarman case, however, is important as essential background information concerning this dispute.

On April 18, 2002, an attorney for Aaron Sugarman and Charlotte Sugarman sent a letter to representatives of Chartered Benefit, Liberty Life Insurance Company ("Liberty"), and Washington Mutual, Inc. ("Washington Mutual") (the "Demand Letter"). (Pl. SF ¶ 13.) Chartered Benefit received the Demand Letter on April 22, 2002. (*Id.* ¶ 14.) The Demand Letter alleged as follows:

> Mr. Sugarman received a highly deceptive call from Liberty Life Insurance Company, administered by Chartered Benefit Services, Inc., after which call Liberty Life Insurance Company apparently wrongfully notified Washington Mutual, Inc. that the Sugarmans had agreed to pay $53 per month when no such agreement occurred.
>
> Later Washington Mutual withdrew $53 per month from Mr. and Mrs. Sugarman's account until the Sugarmans realized it was occurring and demanded that it cease and that their funds be returned. So far their funds have not been returned. Nor did the Sugarmans ever receive any certificate of insurance or other written information from any insurance company.

---

[2]     The facts in this case are almost entirely uncontroverted. To the extent a material fact is in dispute, where a party failed to properly support its denial of a statement, and that statement is properly supported in the record, the Court deems it admitted. Local Rule 56.1(a); *accord, e.g., McGuire v. United Parcel Serv.*, 152 F.3d 673, 675 (7th Cir. 1998); *Malec v. Sanford*, 191, F.R.D. 581, 584 (N.D. Ill. 2000).

(*Id.* ¶ 15.) The Demand Letter informed Chartered Benefit that a "class action lawsuit" would be filed and demanded the return of monies paid by the Sugarmans, as well as interest and attorneys' fees. (*Id.* ¶ 16.)

On April 24, 2002, Chartered Benefit sent the Demand Letter to Liberty, a licensed insurance company, with the understanding that Liberty would defend and indemnify Chartered Benefit. (Def. SF ¶¶ 17-18.)[3] (Chartered Benefit is not insurance company or carrier; however, its business activities include the marketing and administration of mortgage accidental death insurance. (*Id.*, Ex. Tylin Aff. ¶¶ 4, 6.)) In the normal course of Chartered Benefit's business, Chartered Benefit forwarded all correspondence pertaining to Liberty products that deal with regulatory and/or legal matters to Liberty. (Def. SF ¶ 19.) For approximately four months, Liberty and/or its outside counsel communicated with the Sugarmans' attorney regarding the substance of the Demand Letter. (*Id.* ¶ 22.)

On June 17, 2002, the Sugarmans filed a class action complaint in the Circuit Court of the State of Oregon for the County of Multnomah, styled *Aaron Sugarman and Charlotte Sugarman v. Liberty Life Insurance Co., Chartered Benefit Services, Inc. and Washington Mutual Bank*, Case No. 0206-05925 (the "Sugarman Complaint"). (*Id.* ¶ 23.) The Sugarman Complaint alleged state law claims. (*Id.*) On July 16, 2002, on the defendants' motion, the action was removed to the United States District Court for the District of Oregon. (*Id.* ¶ 24.) Shortly thereafter, the Sugarmans filed a class action complaint in federal court (the "Sugarman Class Action Complaint"). (*Id.* ¶ 25.) The Sugarman Class Action Complaint advanced claims for

---

[3]     Paragraphs 17 through 22 of Chartered Benefit's statement of facts are deemed admitted pursuant to Local Rule 56.1(b).

alleged violations of various state and federal consumer protection statutes, as well as state common law claims. (*Id.*)

In or about August of 2002, Chartered Benefit was informed for the first time that Liberty would not defend against the Sugarman Claim on Chartered Benefit's behalf. (*Id.* ¶ 26.)[4] Thereafter, on September 10, 2002, Chartered Benefit reported the Sugarman Claim to its insurance broker, Shepherd Riley Coughlin ("SRC"), and requested that SRC report the matter to Chartered Benefit's insurers. (*Id.* ¶ 27.) SRC reported the Sugarman Claim to Chartered Benefit's directors and officers ("D & O") insurance carrier, Carolina Casualty Insurance Company. (*Id.*) In October 2004, Chartered Benefit learned that SRC had not properly notified its errors and omissions insurance carrier, Executive Risk, of the Sugarman Claim. (*Id.* ¶ 28.)

There is no meaningful dispute that Chartered Benefit did not report the Demand Letter to Executive Risk until after June 1, 2002. (D.E. 2 (Def. Ans.) ¶ 24.) Specifically, S.H. Smith & Company ("Smith"), on behalf of Chartered Benefit, provided Executive Risk with a "FIRST NOTICE OF LOSS" in a letter dated October 24, 2002 (the "Smith Letter"). (Pl. SF ¶ 18.) The Smith Letter included the Demand Letter, as well as a letter dated June 17, 2002 from the Sugarmans' counsel enclosing a copy of the Sugarman Complaint and Sugarman Class Action Complaint. (*Id.* ¶¶ 18, 20.)

On October 25, 2002, Washington Mutual demanded that Chartered Benefit defend and indemnify it against the Sugarman action. (Def. SF ¶ 30.)[5] Chartered Benefit paid fees and costs totaling $335,439.38 to defend itself against the Sugarman action. (*Id.* ¶ 41.) After protracted

---

[4]     Deemed admitted pursuant to LR 56.1(b).

[5]     Deemed admitted pursuant to LR 56.1(b).

negotiations, Chartered Benefit paid $100,000 to settle the Sugarman action, and $300,000 to

settle the Sugarman action against Washington Mutual,[6] which included legal fees. (*Id.* ¶¶ 42-

43.)[7]

On October 28, 2002, a claims analyst for Chubb & Son, a division of Federal Insurance

Company, which serves as the claims manager for its affiliate, Executive Risk, sent a letter to

Chartered Benefit stating, "I will provide a written initial coverage analysis under the Policy as it

relates to this case. In the interim, please understand that Executive Risk . . must reserve all

rights and defenses under the Policy and applicable law." (*Id.* ¶ 33.) On January 20, 2003, the

claims analyst sent another letter to Chartered Benefit stating:

> We are currently in the process of completing our coverage analysis . . . there
> appear to be dispositive issues which we are continuing to investigate . . . If after
> full review, we determine that coverage is in order, we will agree to apply
> reasonable and necessary covered Defense Expenses to the Deductible . . . In the
> interim, ERII [Executive Risk] reserves all of its rights, remedies and defenses
> including the right to decline defense and indemnity.

(*Id.* ¶ 34.) Chartered Benefit cooperated with Executive Risk throughout Executive Risk's

handling of the Sugarman Claim. (*Id.* ¶ 35.)

---

[6]     Washington Mutual is not a real party in interest in this case. (*See* D.E. 34 (order
of court requesting clarification concerning propriety of diversity jurisdiction); D.E. 33 (response
of Chartered Benefit clarifying that Washington Mutual is not a real party in interest).)
Furthermore, even if Washington Mutual's citizenship were germane, the Court notes that its
principal place of business is located in the State of Washington and it is incorporated in the
State of Washington. (*Id.*) Chartered Benefit is exclusively a citizen of Illinois (Def. SF ¶ 1) and
Executive Risk is a citizen of Delaware (state of incorporation) and New Jersey (principal place
of business). (*Id.* ¶ 2.) Accordingly, even if Washington Mutual's citizenship did need to be
evaluated as against Executive Risk's, complete diversity would still exist.

[7]     On July 22, 2003, the Sugarman action was dismissed with prejudice. (Def. SF ¶
44.)

On May 14, 2003, Executive Risk notified Chartered Benefit that it was denying insurance coverage of the Sugarman Claim. (*Id.* ¶ 37.) On the same date, Executive Risk filed the Complaint for Declaratory Judgment in this Court. (*Id.* ¶ 36.)

B.    The Insurance Policies

Executive Risk issued two "claims made and reported" insurance policies to Chartered Benefit under the title BrokerNet Insurance Agents and Brokers Professional Liability and Employment Practices Liability Policy. (Pl. SF ¶ 5; Ex. A and B) As stated on the Declarations page at the beginning of each policy, the policy period (the "Policy Period") of the first policy runs from an Inception Date of June 1, 2001 to an Expiration Date of June 1, 2002 (the "2001 Policy), and the Policy Period of the second policy runs from an Inception Date of June 1, 2002 to an Expiration Date of June 1, 2003 (the "2002 Policy") (collectively, the "Policies"). (*Id.*)

Each of the Policies includes the following Insuring Agreement:

(A) The Underwriter will pay on behalf of the Insured(s) Loss which the Insurers become legally obligated to pay as a result of Claims first made against them and reported in writing to the Underwriter during the Policy Period or, if applicable, the Extended Reporting Period, for Wrongful Act(s) first committed by them on or after the Retroactive Date stated in ITEM 7(a) of the Declarations.

(Pl. SF ¶ 6.) The top of the Declarations page with respect to each of the Policies provides, in large and bold print: "NOTICE: THIS IS A CLAIMS MADE AND REPORTED POLICY WHICH APPLIES ONLY TO 'CLAIMS' FIRST MADE AND REPORTED DURING THE

'POLICY PERIOD' . . ." (*Id.* ¶ 7 (bold not included).) [8] The Policies define "Claim" in relevant

part as:

> any written demand received by any Insured from any person or entity other than
> an Insured seeking to hold one or more of the Insureds responsible for monetary
> damages resulting from Wrongful Acts actually or allegedly committed by an
> Insured or by any other person for whose Wrongful Acts an Insured is legally
> responsible.

(*Id.* ¶ 8.)

The Policies define "Policy Period" as "the period from the Inception Date to the

Expiration Date, or to any earlier cancellation date." (*Id.* ¶ 9.) Under each of the Policies,

"Inception Date" means "the time and date set forth in ITEM 2(a) of the Declarations" and

"Expiration Date" means "the time and date set forth in ITEM 2(b) of the Declarations." (*Id.*)

Pursuant to ITEMS 2(a) and 2(b) of their respective Declarations pages, the 2001 Policy covers

the "Policy Period" from June 1, 2001 to June 1, 2002, and the 2002 Policy covers the "Policy

Period" from June 1, 2002 to June 1, 2003. (*Id.*)

The Policies each include the following Condition:

> (B)    Notice
>
>     (1)    As a condition precedent to any right to coverage afforded by this Policy,
> including any payment of Defense Expenses, the Insureds must give
> written notice to the Underwriter of any Claim as soon as practicable after
> such Claim is first made and . . . during the Policy Year in which such
> Claim is made. A Claim is deemed first made when any Insured receives
> any written demand described in DEFINITION (B).

---

[8]    Deemed admitted pursuant to LR 56.1(b). The Court also notes that this opinion
does not duplicate the prolific use of bold text in the Policies, as it is not material to the result in
the case. If anything, in the Court's view, the use of bold text confirms and supports the result
reached herein, but there is so much bold text in the Policies that it does not make a significant
impact and the inclusion of the bold text in this opinion would principally be a distraction for the
reader.

(*Id.* ¶ 10.)  The Policies define "Policy Year" and "Wrongful Act" as follows:

> (N)  "Policy Year" means the period from the Inception Date to the first Anniversary Date and the period from any Anniversary Date to its succeeding Anniversary Date.  Immediately upon the end of the Policy Period, the Policy Year then in effect will also end.  If the Policy Period is no more than (1) year in length, the terms "Policy Period" and "Policy Year" will be synonymous.

> (S)  "Wrongful Act" means any actual or alleged act, error or omission or breach of duty by any Insured solely in such Insured's performance of, or failure to perform, Professional Services.

(*Id.* ¶ 11.)  The Policies each contain the following Exclusion, among others (the "Exclusion"):

> (C)  This Policy will not apply to any Claim based on or directly or indirectly arising out of or resulting from any act, error, omission, fact, circumstance, situation, transaction, event or decision:

> (1)  which was the subject of any notice given before the Policy Period under any other policy of insurance; or

> (2)  of which, on or before the Inception Date, any Insured had knowledge and which could reasonably have been foreseen as likely to be the basis of a Claim within the scope of the insurance afforded by this Policy.

> If, however, this Policy is a renewal of one or more policies previously issued by the Underwriter to the Named Insured, and the coverage provided by the Underwriter to the Named Insured was in effect, without interruption, for the entire time between the inception date of the first such other policy and the Inception Date, the reference in this EXCLUSION (C) to the Inception Date will be deemed to refer instead to the inception date of the first policy under which the Underwriter began to provide the Named Insured with continuous and uninterrupted coverage of which this Policy is a renewal.

(Def. SF ¶ 9.)


## II.    Jurisdiction, Venue, And Choice of Law

The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because

Executive Risk and Chartered Benefit are citizens of different states and the matter in

8

controversy exceeds the sum of $75,000, exclusive of interests and costs. Venue in this District is proper under 28 U.S.C. § 1391.

With respect to choice of law, the parties in this case have based their briefs upon Illinois law. "The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits." *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426 (7th Cir. 1991); *accord, e.g., McFarland v. Gen. Am. Life Ins. Co.*, 149 F.3d 583, 586 (7th Cir. 1998); *St. Paul Reinsurance Co. v. Williams & Montgomery, Ltd.*, No. 00 C 5037, 2001 WL 1242891, *4 (N.D. Ill. Oct. 17, 2001) (Hibbler, J.) (citing *Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470, 473 (7th Cir. 1991)). The Court will therefore apply Illinois law in interpreting the insurance contracts at issue. The case law of other jurisdictions is cited when no binding Illinois law exists or it illuminates general principles.

### III.   Summary Judgment Standards

"Summary judgment may be awarded to insurers in declaratory judgment actions when, as a matter of law, the insurance policy does not cover the underlying claim." *Zurich Ins. Co. v. Sunclipse, Inc.*, 85 F. Supp.2d 842, 848 (N.D. Ill. 2002), *aff'd* 241 F.3d 605 (7th Cir. 2001) (citing *Microtec Research, Inc. v. Nationwide Mut. Ins. Co.*, 40 F.3d 968 (9th Cir.1994)). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party."

*Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). When considering cross-motions for summary judgment, the court considers the motions simultaneously, "extend[ing] to each party the benefit of any factual doubt when considering the other's motion." *Buttitta v. City of Chicago*, 803 F.Supp. 213, 217 (N.D.Ill. 1992), *aff'd* 9 F.3d 1198 (7th Cir. 1993).

## IV.    Discussion

The Policies provide a type of liability insurance coverage commonly known as "Errors and Omissions" coverage. *See* 1 *Couch on Ins.* § 1:35 (2005) (explaining that this type of coverage protects against liability based on the failure of the insured to comply with the standard of care of the insured's profession). (Def. SF ¶ 28.) The most common types of "Errors and Omissions" coverage are (i) "occurrence" coverage and (ii) "claims made" coverage. *See, e.g., Nat'l Union Fire Ins. Co. v. Bauman*, No. 90 C 0340, 1992 WL 1738, *4 (N.D. Ill. Jan. 2, 1992) (Zagel, J.) (citing Appleman, 7A *Insurance Law and Practice* § 4504.01, at 312-13 (1979)), *aff'd* 997 F.3d 305 (7th Cir. 1993).

An occurrence policy is one in which the event or cause giving rise to liability must occur during the policy term as a precondition to coverage, without regard to the date of discovery of the event or cause. *Id.* In other words, "'the peril insured is the "occurrence" itself. Once the occurrence takes place, coverage attaches even though the claim may not be made for some time thereafter.'" *Am. Nat'l Fire Ins. Co. v. Abrams*, No. 99 C 5807, 2002 WL 243455, *3 (N.D. Ill. Feb. 19, 2002) (Guzman, J.) (quoting *Bauman*, 1992 WL 1738 at *5 (in turn citing S. Kroll, *The Professional Liability Policy 'Claims Made'*, 13 *Forum* 842, 843 (1978)).

10

In contrast, a claims made policy is one in which coverage is conditioned on a claim having been asserted against the insured during the policy period. *Abrams*, 2002 WL 243455 at *3. A "claims made and reported" policy requires that the claim against the insured, and the report of such claim to its carrier, occur within the same policy period as a precondition to coverage. *Id.* (citing *Continental Cas. Co. v. Cuda*, 715 N.E.2d 663, 669 (Ill. App. Ct. 1999)). In this regard, "'it is the making of the claim which is the event and peril being insured and, subject to policy language, regardless of when the occurrence took place.'" *Id.* (quoting *Bauman*, 1992 WL 1738 at *5 (in turn citing S. Kroll, 13 *Forum* at 843). There is no dispute that the Policies in the case *sub judice* are claims made and reported policies. (Def. Resp. to Pl. SF ¶ 5.) In this regard, each of the Policies states in at least three places that coverage extends only to claims against the insured that are first made and reported during the policy period. (Pl. SF ¶¶ 6 (Insurance Agreement section), 7 (top of Declarations page), and 10 (Conditions section).)

"[T]he reporting requirement of a claims made policy . . eliminate[s] an insurer's 'tail' exposure by minimizing 'the time between the insured event and the payment.'" *Bauman*, 1992 WL 1738 at * 5 (quoting *Chas T. Main, Inc. v. Fireman's Fund Ins. Co.*, 551 N.E.2d 28, 30 (Mass. 1990)). Because the reporting requirement provides insurers greater certitude as to their liability exposure, "an insured [under a claims made policy] pays a lesser premium, and receives broader coverage than under an occurrence policy because conduct occurring before the policy term is covered." *Id.* (internal quotation marks and citations omitted). In this regard, the reporting/notice requirement in a claims made policy is "considered [a] valid condition[] precedent and not just [a] technical requirement." *Williams & Montgomery*, 2001 WL 1242891 at *4 (citing *Home Ins. Co. of Illinois v. Adco Oil Co.*, 154 F.3d 739, 742 (7th Cir. 1998)).

11

"Coverage under a claims-made policy occurs when a claim is made and reported during the specified policy period." *Id.* at *2. That is because, as courts have repeatedly recognized, "the essence of a claims made policy is notice to the carrier within the policy period." *Id.* (collecting cases, including two Illinois appellate decisions).

Given the purpose and function of the reporting requirement in a claims made policy, "such reporting requirements are strictly construed." *Bauman*, 1992 WL 1738 at *6 (citing *Nat'l Union Fire Ins. Co. v. Talcott*, 931 F.2d 166, 168-69 (1st 1991)). In this regard, "[n]umerous courts have held that excusing a delay in notice beyond the claims made policy period would alter a basic term of the insurance contract." *Id.* (internal punctuation and citations omitted). In *Home Ins. Co. of Illinois v. Adco Oil Co.*, 154 F.3d 739 (7th Cir. 1998), the Seventh Circuit noted that "Illinois gives insurers a 'reasonable' time to notify insurers under occurrence policies," but imposes a "more rigid notice requirement" for claims made policies." *Id.*, 154 F.3d at 742[9]; *accord, e.g., Abrams*, 2002 WL 243455 at *3 (citing *Home Ins. Co.*, 154 F.3d at 742); *Pacific Ins. Co. v. Eckland Consultants, Inc.*, No. 00 C 2140, 2001 WL 1388279, *3 (N.D. Ill. Nov. 5, 2001) (Kennelly, J.) (collecting cases); *Williams & Montgomery*, 2001 WL 1242891 at *3 ("Illinois courts . . . have unequivocally stated coverage for the policy period will not extend beyond the policy's expiration date. In short, expiration dates [with respect to claims made policies] are to be strictly construed.") (citations omitted).

---

[9] The Seventh Circuit reasoned that, with respect to claims made policies, "[i]f an insurer must pay despite lack of notice, cooperation, and an opportunity to control the defense, the price of coverage will skyrocket – if the market can continue to exist. Nothing we have seen in the state cases suggests that Illinois has taken that path." *Home Ins. Co. of Ill. v. Adco Oil Co.*, 154 F.3d 739, 743 (7th Cir. 1998).

With the foregoing analysis in mind, the Court addresses whether either of the Policies provides coverage for the Sugarman Claim.

A.     The Making and Reporting of the Sugarman Claim

The Policies define "Claim" to mean any written demand for money resulting from "Wrongful Acts," which are actual or alleged acts of professional misconduct on the part of the insured. (Pl. SF ¶¶ 8-9.) The Demand Letter alleged that Chartered Benefit and others engaged in professional misconduct, demanded the return of funds taken from the Sugarmans' account, plus interest and attorneys' fees, and threatened the filing of a class action lawsuit. (Pl. SF ¶¶ 13-16.) The Court finds that the language in the Demand Letter plainly sets forth a "Claim" under the Policies. The Policies further specify that a "'Claim' is deemed first made when any Insured receives [such] written demand." (*Id.* ¶ 10.) Because it is undisputed that Chartered Benefit received the Demand Letter on April 22, 2002 (Def. Resp. to Pl. SF ¶ 14.), the Court finds that such claim was "first made" against Chartered Benefit during the 2001 Policy Period (between June 1, 2001 and June 1, 2002).

To the extent Chartered Benefit contends that the Sugarman Claim was not "first made" until the formal filing of either the Sugarman Complaint or the Sugarman Class Action Complaint (D.E. 22 at 15)—which were filed *after* expiration of the 2001 Policy Period—this contention has been firmly rejected by cases in this District. For example, *Williams & Montgomery* rejected the argument that a claim was not made when the insured received letters demanding money, but instead was "first made" when the subsequent lawsuit was filed against the insured, as "unreasonable, unrealistic and unpersuasive in light of the well-established law on claims-made policy insurance coverage." *Id.*, 2001 WL 1242891 at *4. Holding that letters

13

demanding an accounting or release of amounts owed constituted a claim as a matter of law, *Williams & Montgomery* explained that "Illinois courts have recognized the common definition of a claim is a demand for money—*id.* (citing *Nat'l Union Fire Ins. Co. v. Cary Comty. Consol. Sch. Dist.*, No. 93 C 6526, 1995 U.S. Dist. LEXIS 1846, *8 (N.D. Ill. Feb. 14, 1995)); *Evanston Ins. Co. v. Sec. Assurance Co.*, 715 F. Supp. 1405, 1412 (N.D. Ill. 1989))—and that "letters demanding payment are enough to put an insured on notice of an impending claim." *Id.* at *5 (citing *Nat'l Union Fire Ins. Co. of Pittsburgh v. Baker & McKenzie*, 997 F.2d 305, 307 (7th Cir. 1993); *Stiefel v. Illinois Ins. Co.*, 452 N.E.2d 73, 77 (Ill. App. Ct. 1983)).[10]

To obtain coverage under either of the Policies, then, Chartered Benefit was required to report the Demand Letter to Executive Risk "as soon as practicable after such claim is first made *and . . . during the Policy Year in which such Claim [was] made*." (Pl. SF ¶ 10 (emphasis added; *accord* Pl. SF ¶ 6 (similar language in Insuring Agreement section of the Policies), *id.* ¶ 7 (similar language in Declarations section of the Policies).) The undisputed facts demonstrate that, even though Chartered Benefit received the Demand Letter during the 2001 Policy Period, it did not report the Demand Letter to Executive Risk until October 24, 2002, after the expiration date of the 2001 Policy Period. (D.E. 2 ¶ 24; Def. SF ¶ 29.) Chartered Benefit "was in a prime

---

[10] The Policies' definition of "Related Claims" supports this result. The Policies define "Related Claims" to mean, in relevant part, "all Claims involving . . . multiple Wrongful Acts . . . which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, event, or decision. Related Claims will be deemed to have been first made at the time the earliest of the Related Claims was first made . . . ." (Pl. SF ¶ 12.) In other words, to the extent the Demand Letter, the Sugarman Complaint, and the Sugarman Class Action Complaint are Related Claims, such claims are deemed to have been "first made" when Chartered Benefit received the Demand Letter.

position to protect itself by simply reporting that a claim had been made." *Williams &*
*Montgomery*, 2001 WL 1242891 at *4 (citing *Baker & McKenzie*, 997 F.2d at 309). Chartered
Benefit "failed to act, and the Court sees no reason why [Executive Risk] should have to pay for
[Chartered Benefit's] inaction." *Id.* Because it is apparent that Chartered Benefit failed to satisfy
the same policy period reporting requirement—that is, the condition precedent to coverage under
the Policies—the Court finds that Executive Risk's duty to defend and indemnify Chartered
Benefit in connection with the Sugarman Claim was not triggered.

B.      The Effect of the Exclusion and the Renewal

Chartered Benefit contends that, notwithstanding the "claims made and reported"
language in the Policies, the Exclusion permits an insured, who renews its insurance policy and
received a claim during the initial policy period, to wait to report the claim to Executive Risk
until a subsequent policy period. (D.E. 21 at 10-12.) Put differently, Chartered Benefit contends
that the fact that the Sugarman Claim was not reported to Executive Risk until the 2002 Policy
Period, even though the claim was made during the 2001 Policy Period, is irrelevant because
language in the Exclusion created seamless coverage between the initial policy (the 2001 Policy)
and the renewal policy (the 2002 Policy). Based on well-settled rules of insurance contract
interpretation—including "the principle that an exclusion from insurance coverage cannot create
coverage," *Cont. Cas. Co. v. Pitt. Corning Corp.*, 917 F.2d 297, 300 (7th Cir. 1990) (citations
omitted)—and caselaw addressing renewal of claims made policies, the Court respectfully
disagrees.

By way of background, the essential components of general liability insurance include (i)
declarations, (ii) insuring agreements and definitions, (iii) exclusions, (iv) conditions, and (v)

endorsements. *Standard Fire Ins. Co. v. Chester O'Donley*, 972 S.W.2d 1, 7 (Tenn. App. Ct. 1998) (citing George H. Tinker, *Comprehensive General Liability Insurance—Perspective and Overview*, 25 Fed'n Ins. Couns. Q. 217, 222 (1975), and 2 Rowland H. Long, *The Law of Liability Insurance* § 10.04 [2] (1997)); *see also* Robert J. Prahl, *Introduction to Claims* 37 (1988). "When coverage questions arise, these components should be construed in . . . [this] order to avoid confusion and error." *Chester O'Donley*, 972 S.W.2d at 7 (citing Tinker, *Comprehensive General Liability Insurance*, 25 Fed'n Ins. Couns. Q. at 222 (1975), and 2 Long, *The Law of Liability Insurance* § 10.04 [2]). "The insuring agreement sets the outer limits of an insurer's contractual liability. If coverage cannot be found in the insuring agreement, it will not be found elsewhere in the policy." *Id.* In this case, the Declarations and the Insuring Agreement unambiguously set forth the "claims made and reported" nature of the coverage provided under the Policies. *See infra.*

An exclusion in an insurance policy agreement is a limitation of liability or a carve-out of certain types of loss to which the coverage of the policy does not apply. It is axiomatic that "exclusions can only decrease coverage, they cannot increase it." *Chester O'Donley*, 972 S.W.2d at 8 (citing, *inter alia*, *Stanford Ranch, Inc. v. Maryland Cas. Co.*, 89 F.3d 618, 626 (9th Cir. 1996); *Continental Cas. Co. v. Pitt. Corning Corp.*, 917 F.2d 297, 300 (7th Cir. 1990); *Maimone v. Liberty Mut. Ins. Co.*, 695 A.2d 341, 344 (N.J. 1997); 13 John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 7387, at 175 (1976)). In this regard, the Seventh Circuit has stated: "there is one principle of contract interpretation that we have employed implicitly, and it may be useful to bring it out into the open. That is the principle that an exclusion from insurance coverage cannot create coverage." *Continental Cas. Co.*, 917 F.2d at

16

300. Accordingly, the Court finds that the Exclusion cannot broaden the Policies' coverage to make them cover a claim indisputably "first made" during the 2001 Policy Period, but not reported to Executive Risk until the 2002 Policy Period.

Chartered Benefit contends that the exclusion language must be read to expand the coverage—or alternatively, must be read so as to create an ambiguity that must be construed in its favor—because Executive Risk's reading of the final paragraph of Exclusion III(C) and the other portions of the Policies purportedly "renders Exclusion 3(C) redundant," in that it does not alter the fundamental requirement that a claim made in one period must be reported in that policy period. (D.E. 32 at 3.) This argument is misplaced. The Seventh Circuit has specifically taught that the anti-redundancy canon often is not helpful when interpreting disputed contractual language because parties and their attorney-drafters often "want[] to make assurance doubly sure" about a point, "a desire that explains much apparently superfluous language in contracts." *In the Matter of Chicago, Milwaukee, St. Paul and Pacific R.R. Co.*, 791 F.2d 524, 530 (7th Cir. 1986); *accord, e.g., Williams v. J.C. Penney Life Ins. Co.*, 226 F.3d 408, 411 (5th Cir. 2000) ("Superfluous exceptions are commonplace, however, and have the effect merely of mak[ing] assurance doubly sure."); *see also Continental Cas. Co.*, 917 F.2d at 300-01 (explaining that exclusions cannot create insurance coverage and viewing duplicative language in an exclusion that addressed a subject that was not covered by the insurance policy in any event as "pure surplusage."). Second, Executive Risk's reading of the exclusionary language is one that is rooted in the text of the operative final paragraph of Exclusion III(C). Specifically, Executive Risk reads that final paragraph of Exclusion III(C) to provide flexibility for an insured who had knowledge of a fact or circumstance during one Policy Period that could reasonably be the basis

17

of a potential future Claim—but that was not yet a Claim (unlike the situation in the case *sub judice*)—to seek coverage under a subsequent policy when a Claim actually is made. (*See* D.E. 28 at 12.) That reading flows from the text of the final paragraph of Exclusion III(C), which specifically speaks to the meaning of the term "Inception Date" as used earlier in Exclusion III(C); that term addressed only putative but inchoate claims that, unlike the situation here, were not made in an earlier Policy Period. In contrast, Chartered Benefit's proposed reading of the language in the final paragraph of Exclusion III(C)—*i.e.*, that it creates an open-ended insurance period in which the insured can wait indefinitely, even after claims are actually made—substantially expands and distorts the language of the final paragraph.

Case law in this District and elsewhere also militates against a finding that renewal of the policy created a single policy period for claims reporting purposes. *See, e.g., Checkrite Ltd., Inc. v. Illinois Nat'l Ins. Co.*, 95 F. Supp.2d 180, 194 (S.D.N.Y. 2000) ("[M]ost courts . . . . have concluded that a renewal does not extend the reporting period for claims made during the earlier policy period.") (collecting cases). For example, in *Bauman*, the plaintiff insured a claims made policy with terms and conditions nearly identical to the terms and conditions contained in the Policies at issue here; that is, the policy covered only those claims that were first made against the insured and reported to the insurance company during the policy period. *Id.*, 2002 WL 243455 at *2-3. The insurance claim at issue in *Bauman,* like the Sugarman Claim, was first made during the initial policy period, but was not reported to the plaintiff insurance company until a subsequent policy period. *Id.* at *3. Under these facts, Judge Zagel concluded that:

> [T]he well established desire for actuarial certainty that underlies claims made coverage thoroughly undermines the . . 'one reporting period' argument. In order for the insurer 'to set its future premiums and reserves with full knowledge of the

18

> outstanding claims it is obligated to meet,' strict adherence to the reporting
> provision is required. *Talcott*, 931 F.2d at 168-69. This is so 'regardless of
> whether the same insurance company continued to provide coverage (through a
> different policy) at the date the notice was received.' *Id.* at 169 (even if
> policyholder is insured under series of renewal policies, claim must still be both
> made and reported within single policy period).

*Id.* at *10[11]; *accord, e.g., Checkrite Ltd., Inc.*, 95 F. Supp. 2d at 191-94 (holding that renewal of

claims made liability policy did not extend reporting period for claims made during previous

policy period).

C.     Chartered Benefit's Other Arguments

In a last attempt to obtain coverage, Chartered Benefit contends that (i) it reported the

Sugarman Claim to Executive Risk "as soon as practicable," given its lack of sophistication with

respect to this type of insurance coverage, and (ii) Executive Risk was not prejudiced by the

delayed reporting. (D.E. 21 at 14.) Neither of these contentions alters the outcome.

As to the first argument, without regard to whether or not Chartered Benefit provided

notice to Executive Risk "as soon as practicable," it did not provide notice of the Sugarman

Claim during the 2001 Policy Period, the Policy Year in which such Claim was made. Because

the Sugarman Claim was not made *and* reported during the same Policy Period, the plain

language of the Policies dictates that the Policies do not provide coverage of the claim. (Pl. SF ¶

6); *accord, e.g., Bauman*, 1992 WL 1738 at *11 n.11 ( "A 'claims made' policy can contain the

---

[11]     Like the policies in *Bauman*, there are further indicia that the 2001 Policy and
2002 Policy are separate policies with separate policy periods. *See* 1992 WL 1738 at *11 n.12.
Each of the Policies required a separate application; each contained different limits of retention;
and each contained different endorsements (D.E. 14, Ex A. and B). *See id.*

'as soon as practicable' language and remain 'claims made,' since the 'claims made' character of

a policy only turns on the existence of the requirement that the claim be reported during the term

of the policy.") (quoting *Talcott*, 931 F.2d at 168); *Abrams*, 2002 WL 243455 at *3 (quoting

*Continental Cas. Co. v. Cuda*, 715 N.E.2d 663, 669 (Ill. App. Ct. 1999)); *Williams &*

*Montgomery*, 2001 WL 1242891 at *2 (collecting cases, including Illinois appellate authority,

and stating that "[t]he courts have recognized the essence of a claims made policy is notice to the

carrier within the policy period."). Accordingly, the Court finds that, even if Chartered Benefit

had reported the Sugarman Claim "as soon as practicable," an issue which the Court need not

consider or resolve, the Policies do not cover the Sugarman Claim.[12]

Chartered Benefit's lack of prejudice argument is similarly off the mark. Cases in this

District uniformly hold that the "issue of prejudice is irrelevant in the context of a 'claims-made'

insurance policy." *Pacific Ins. Co. v. Eckland Consultants, Inc.*, No. 00 C 2140, 2001 WL

1388279, *3 (N.D. Ill. Nov. 5, 2001) (citing, *inter alia*, *Cuda*, 715 N.E.2d at 669, and

*Montgomery Ward & Co., Inc. v. The Home Ins. Co.*, 753 N.E.2d 999, 1004 (Ill. App. Ct .2001));

*accord, e.g., Williams & Montgomery*, 2001 WL 1242891 at *4 ("A showing of prejudice is only

required in instances involving an occurrence policy.") (collecting Illinois cases). Lack of

---

[12]     Although not material to the Court's decision, the Court notes that Chartered
Benefit's self-serving assertions about its purported lack of sophistication with Errors and
Omissions or general liability insurance coverage rings rather hollow. By its own account,
Chartered Benefit generates annual revenues of approximately $55 million, and its business
operations include, among other things, the marketing and administration of mortgage accidental
death insurance. (Def. SF, Ex. Tylin Aff. ¶¶ 4-5.) Laypeople are expected to comply with their
contractual obligations and requirements, absent extraordinary circumstances; as a result,
Chartered Benefit, a substantial corporate actor, is a poor candidate for a defense based on a
purported lack of sophistication in this area of business.

prejudice to an insurer may be a factor in determining whether reasonable notice had been given with respect to occurrence policies (as opposed to claims made policies) in order "to protect an insured against forfeiture of contractual rights, based on technical grounds" and to assist the insurer in "investigation, settling and defending covered claims." *Bauman*, 1992 WL 1738 at *9 (internal quotation marks and citation omitted). However, with respect to claims made policies, the notice provision helps define the scope of coverage under the policy, and thus "[p]rejudice for an untimely report [is therefore] not an appropriate inquiry." *Id.* (collecting cases; internal quotation marks and citation omitted).

## V.    Conclusion

For the reasons stated above, Executive Risk's Motion for Summary Judgment is granted. Chartered Benefit's Cross-Motion for summary judgment is denied.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Date: July 29, 2005